**EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES,**
**Plaintiff, v. ROBINSON, Supt. of Insurance, Defendant.**

Common Pleas Court, Franklin County.

No. 181605. Decided September 19, 1957.

Wright, Harlor, Purpus, Morris & Arnold, Squires, Sanders & Dempsey, Milbank, Tweed, Hope and Hadley, for plaintiff.

William Saxbe, Atty. Genl., Paul R. Gingher, Special Counsel, for defendant.

## OPINION

By GESSAMAN, J.

In this action the plaintiff seeks (1) the declaration of this Court (a) construing §9404 GC (now §3911.20 R. C.), as not prohibiting the operation of plaintiff's Assured Home Ownership Plan in Ohio; (b) that said plan does not violate said section and is not illegal; and (2) for an order (a) enjoining the defendant from taking any proceedings or steps to compel the plaintiff to discontinue said plan in Ohio and (b) from taking or instituting any proceedings for the revocation of plaintiff's license to do business in the State of Ohio by reason of the operation of the plan in Ohio. The case has been submitted to the Court upon the pleadings, the evidence, including certain stipulations, and the briefs of counsel.

Plaintiff is a corporation organized and existing under the laws of the State of New York and is licensed to transact business in Ohio. It is engaged in the business of selling life, health and accident insurance and annuity contracts not only in Ohio but in all states and the District of Columbia. In the same territory, plaintiff is also engaged in the business of investing its assets and reserves in certain investments, including loans secured by mortgages on real estate and other forms of collateral.

Counsel have stipulated that

1. Plaintiff has developed and operates in the State of Ohio an investment program for the making of long-term, monthly amortizing residential loans which is now known as the Assured Home Ownership Plan, hereinafter referred to as the Plan.

2. Said loans are made pursuant to that portion of Section 81, subdivision 6 (a) of the Insurance Law of the State of New York, which limits the making of first lien mortgage loans to an amount which does not exceed two-thirds of the value of the real property securing the same.

Counsel have also stipulated that the plan is in part as follows:

(a) Plaintiff loans funds on promissory notes, secured by mortgages on residences to home owners in conjunction with insurance on the lives of the borrowers.

(b) The property upon which the mortgage loan is placed must meet standards of location, design and appraisal. The dwelling may be already owned or the loan may be the primary means of acquiring or building it.

(c) There is a selection of borrowers, as well as properties, in that the applicant must be a good financial and moral risk. The amount and duration of a particular loan are determined not only by the condition of the property, but also by the prospective earning power of the family provider.

(d) Life insurance protection is required to cover the contingency of the cessation of earning power of the family provider because of his death. The person insured must be the support of the family and if the dwelling is owned by the wife but the husband is the support of the family, the insurance must be on the life of the latter. The life insurance may be either insurance, issued by the plaintiff, already in force or insurance newly issued by the plaintiff of types of insurance such as Ordinary Life, Adjustable Whole Life, Limited Payment Life and Endowment forms, as the applicant may select. The use of such types of insurance provides cash and loan values in the policy which, subject to the approval of plaintiff, may be used to tide the loan over periods of sickness, financial embarrassment or unemployment, and when such values equal the unpaid balance of the loan, they may be used to pay off the mortgage. Under the assignment hereinafter referred to, the persons insured under the Plan may only use the cash values on the life insurance to meet monthly or final payments on the mortgage-secured loans and this only with the approval of plaintiff or withdraw said cash values when the loans secured by such mortgages are paid in full. No such limitation is contained in the terms of the policy providing said life insurance but a copy of the assignment is attached to the policy.

(e) The rates of interest on such loans, the minimum and maximum amounts of loans, and the terms of repayment have varied from time to time through the years, depending on changes in interest rates in the lending market, on market practices and other conditions in the residential loan field.

(f) Plaintiff now makes no other form of residential loans.

(g) When new insurance is to be·used, the insurance must be in full force and effect before a commitment for a loan will be made. Agents of the plaintiff who are licensed to solicit insurance business are author-

ized to accept applications for loans for transmittal to the plaintiff's Residential Mortgage Department.

(h) When an application for a loan is submitted, the applicant is required to make a good faith deposit of $25.00 and a deposit to cover the cost of appraiser's and photographer's fees and receives a receipt therefor. The loan application is forwarded to the local office of the plaintiff's Residential Mortgage Department where it is processed exclusively by the salaried employees of that office. Then the property is inspected and appraised; photographs and surveys, when necessary, are made, and title opinions of attorneys or title policies obtained. If life insurance on the life of the borrower has been assigned to the plaintiff and the loan for which the borrower applied has been closed, plaintiff assumes the cost of appraiser's and photographer's fees with reference to the property on which the mortgage loan is granted.

(i) Determination as to the desirability of the loan is made wholly independent of any life insurance consideration. If the loan is found to be desirable and if life insurance issued by the plaintiff (existing or newly issued) is in force as provided under the Plan, the Residential Mortgage Department at the Home Office will thereafter, if it approves the application for the loan, make a commitment to advance the amount of the loan applied for, subject to the usual title closing requirements and assignment of the life insurance policy to plaintiff.

(j) Whether existing insurance or newly issued insurance is involved, the loans are closed in the customary way by local attorneys or title companies and plaintiff tokes a note secured by a first mortgage as well as an assignment of the life insurance theretofore placed in force. The policy or policies are stamped to indicate that they have been assigned to plaintiff and are to be returned to the insured. In addition to the life insurance, plaintiff requires fire and windstorm insurance on the property to protect the loan.

(k) By the terms of the assignment of the policy to the plaintiff, the insured reserves the right to change the beneficiary named in the policy to receive the amount due in excess of the amount required to pay off the loan. The insured also reserves the right to withdraw in cash any dividends apportioned to the policy; but if he does not withdraw a dividend in cash, but elects to apply such dividend to purchase 'dividend additions' or 'dividend deposits,' then they become subject to the lien of the assignment.

(L) The life insurance to be provided may be either existing insurance with the plaintiff, or new insurance issued by the plaintiff, or a combination of both. In any case, the insurance must be in an amount equal to the loan. Whether existing insurance or new insurance or both are used, level monthly payments are arranged, each of which includes interest on the mortgage, amortization and the life insurance premiums, so that the borrower can pay off his loan in equal monthly installments over the term of the loan. The loan periods vary from ten and one-half to twenty-five years and if the family provider should die before the

loan has been repaid, the mortgage is cancelled and (except where the insured has made a loan on his policy) an amount equivalent to all payments previously made on account of the principal of the loan is paid to the beneficiary named in the policy. When the borrower completes the mortgage payments, the assignment of the policy is cancelled and he can continue the policy, discontinue it, or convert it in any manner otherwise possible.

(m) When existing insurance of the plaintiff is used to protect the loan, the policy may have to be changed or supplemented so as to provide a policy equivalent in face amount to the amount of the loan, and the method of premium payments has to be changed so as to provide for the inclusion of premiums in the level monthly installments that become due under the Plan on the first of each month.

(n) Applications for new insurance are processed exclusively by the plaintiff's underwriting department. At the time of making application for the insurance, the applicant is required to and does pay the first premium for such insurance and obtains a receipt placing the insurance in effect on the date of the receipt, provided only that the applicant is an insurable risk under the plaintiff's rules and the application is otherwise acceptable for the type and the amount of the insurance and at the rate of premium applied for. If the application for the loan is disapproved, the insurance which is then in force is not affected thereby.

The evidence discloses that plaintiff operated the plan in Ohio from 1915 to 1932 when it was discontinued because of the depression. Operation of the plan started again in this state in 1941. Early in that year the Attorney General of Ohio rendered his opinion to the Superintendent of Insurance to the effect that the "plan * * * does not violate §§9403 and 9404 GC, or any other provision of law." In 1950, the Attorney General of West Virginia held that the plan violated West Virginia law and later in the same year the Attorney General of Ohio held that the plan "violates §9404 GC, prohibiting any life insurance company from giving or offering to give, as an inducement for insurance, the loan of any money, directly or indirectly." This latter ruling is the basic reason for the filing of this law suit.

The language of the statute which must be considered in determining the issues of this case is found in the second paragraph of §3911.20 R. C. (formerly §9404 GC). This paragraph reads as follows:

"No life insurance company doing business in this state, or any officer, agent, employee, or representative thereof, nor any other person, shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, as an inducement to insurance, nor shall any person, partnership, or corporation knowingly receive as such inducement to insurance, any rebate of premium payable on the policy or any special favor or advantage in the dividends or other benefits to accrue thereon, or any special advantage in the date of a policy or date of the issue thereof, or any valuable consideration or inducement. Nor shall such company or person give, receive, sell, or purchase, or offer to give, re-

ceive, sell or purchase as inducements to insurance or in connection therewith, any stocks, bonds, or other obligations or securities of any insurance company or other corporation, association, partnership, or individual, or any dividends or profits to accrue thereon, or any paid employment or contract for service of any kind, or anything of value; nor shall such company or person give or offer to give, or enter into any separate agreement promising to secure, as an inducement or consideration for insurance, the loan of any money, either directly or indirectly, or any contract for services."

In view of the fact that there are no reported decisions on the questions raised herein, we must of necessity resort to a careful analysis of the statute. Deleting from the paragraph in question, all language not applicable to this case and of all synonymous words, we find four inhibitions. The last two are discovered by separating the last sentence after the last semi-colon. These inhibitions are as follows:

1. "No life insurance company doing business in this state or any * * * agent * * * shall * * * allow, give or offer to * * * allow or give, directly or indirectly, as an inducement to insurance * * * any valuable consideration or inducement."

2. "Nor shall such company or person, give * * * sell * * * or offer to give * * * sell, as an inducement to insurance or in connection therewith * * * anything of value;"

3. "* * * nor shall such company or person give or offer to give * * * as an inducement or consideration for insurance, the loan of any money, directly or indirectly * * *."

4. "* * * nor shall such company or person * * * enter into any separate agreement promising to secure, as an inducement or consideration for insurance, the loan of any money either directly or indirectly * * *."

The last inhibition just quoted (number four) may be disposed of quickly by observing that there is no evidence of any such separate agreement. The evidence is clear that the local agent takes the application for both the loan and the new insurance (if none is then in effect) and these applications are forwarded by him to the home office for approval or disapproval. The approval of the life insurance application is not dependent upon the approval of the loan application but the approval of the latter is dependent upon the approval of the former. There is, however, no evidence of any separate agreement ever having been made to secure a loan as inducemnt or considration for insurance, either directly or indirectly. The plan itself does not call for such an agreement.

In considering inhibitions one and three, supra, we must keep in mind that the inducement may be and often is the motive for entering into a contract. It is not to be confused with the consideration of the contract itself. **11 O. Jur. (2) 304.** Section 66 on "Contracts." The words "inducement" and "consideration" as used in number three, supra, are synonymous. They are undoubtedly used synonymously in number one.

supra, because any inducement would, in all probable instances, be consideration of some value to the promissee. Therefore, in considering number one, the question is as to whether or not there is any evidence that the plaintiff or any of its agents in Ohio, has allowed or given or offered to allow or give, directly or indirectly, **as an inducement to insurance** any valuable consideration or inducement. In our opinion there is none. In considering number three, supra, the question is as to whether there is any evidence that the plaintiff or any of its agents, in Ohio, has given or offered to give **as inducement or consideration for insurance**, the loan of any money, directly or indirectly. In our opinion, there is none. In passing we feel compelled to observe that the language used in this part of the statute is cumbersome and unfortunate, to say the least. It is our feeling that the legislature undoubtedly meant to say: "nor shall such company or person loan or offer to loan any money, directly or indirectly, as an inducement or consideration for insurance." We shall so consider it. There is no evidence of any such act or offer.

Counsel for the defendant contend that, compared with ·other agencies, a lower rate of interest is charged by plaintiff and that this constitutes an inducement for insurance. It is a fact that an interest rate, lower than many lending agencies, is charged but we do not agree that there is any evidence in the record that that fact has been held out by plaintiff or any of its agents in this state **as an inducement for insurance**. There is no doubt but that a lower interest rate will attract borrowers. A lower price usually does attact a prospective purchaser. But the plaintiff's loan policies are not in issue in this case, unless there is evidence that plaintiff or its agents has loaned or offered to loan money, directly or indirectly as an inducement or consideration for insurance. If the latter element has not been or is not present, we can find no violation of the statute. There is no evidence that it is or has been a part of any transaction.

A careful examination of the details of the plan discloses that there is no element of inducement for insurance in the plan itself. It is true that plaintiff requires its insurance as security for the loan, but the reason for this was fully explained by Mr. John H. Muller, a vice-president of plaintiff company. Briefly stated, with its own insurance, the entire operation is watched with a minimum of work and expense. The record of payments on the mortgage note and the record of payments on the insurance are kept in the plaintiff's offices, whereas, if different security were accepted, plaintiff not only would not have a record of payments on the insurance (the security), but also would have no control over it. Under the plan as outlined, it not only has the record of, but it also has control of the insurance, thereby creating better security for its investments. The plan, per se, as outlined by the evidence, does not place the plaintiff or any of its agents in the position of loaning or offering to loan money or of allowing or giving or offering to allow or give any valuable consideration or inducement **as an inducement or con-**

sideration for insurance. Furthermore, there is no evidence that any agent ever offered to even attempt to secure a loan **as an inducement or consideration for insurance.**

To constitute a violation of these aspects of the statute, the evidence must clearly establish the essential element of inducement or consideration for insurance. In our opinion, there is no evidence that any act has been done for that purpose, and there is, obviously, no evidence that the plan per se contains any such element.

Considering now, number two, supra, it is again clear that the giving or selling or offering to give or sell "anything of value" must be "as an inducement for insurance or in connection therewith" to violate the statute. There is no evidence of any such act. The evidence is clear that "No agent has the power or authority to give, offer or promise to secure a loan." Plaintiff's Exhibit L, page 24, Sec. VI, paragraph 1. Therefore the plan, per se, is not violative of this provision. Furthermore, there is no evidence that either the plaintiff or any of its agents has ever given or promised to give or sold or promised to sell anything of value "as an inducement to insurance or in connection therewith." The evidence is clear that there must be insurance before the loan will be approved but there is no assurance that the loan will be approved merely because insurance is purchased. The result is that under the plan nothing of value is given or promised or sold or promised to be sold as an inducement for insurance or in connection therewith. Again, the latter is an essential element.

Beyond that, under the rule of ejusdem generis, a decrease in the rate of interest (if any) would not be "anything of value" within the meaning of the statute. The rule to be applied is found in **37 O. Jur. 779, Section 450,** as follows:

"In accordance with what is commonly known as the rule of ejusdem generis, where, in a statute, general words follow a designation of particular subjects or classes of persons, the meaning of the general words will ordinarily be construed as restricted by the particular designation and as including only things or persons of the same kind, class, or nature as those specifically enumerated, unless there is a clear manifestation of a contrary purpose. An explanation which has been given for the principle is that if the legislature had meant the general words to be applied without restriction it would have used only one compendious term. In accordance with the rule of ejusdem generis, such terms as 'other,' 'other thing,' 'others,' or 'any other,' when preceded by a specific enumeration, are commonly given a restricted meaning, and limited to articles of the same nature as those previously described."

The specific language makes no reference to interest rates on loans.

Counsel for the parties have referred to the unreported case of The Equitable Life Assurance Society of the United States v. Robert A. Crichton, etc., decided by Honorable Julian F. Bouchelle, Judge of the Circuit Court of Kanawha County, West Virginia, on September 20, 1951. We have been favored with a copy of Judge Bouchelle's opinion

(Plaintiff's Exhibit R), and with a copy of the judgment entry of the case  The judge held that the plan did not violate the laws of West Virginia (somewhat similar to those of Ohio) and also had this to say:

"It is not necessary for the court to engage upon a dissertation as to the meaning of the word 'inducement,' etc; neither is it necessary for the court to discuss the fact raised by the defendant in its brief that the plaintiff will not accept life insurance in other companies.  The reason and necessity for this is obvious."

As already indicated, our feelings are the same.

Counsel for the parties have discussed in their briefs the effect of administrative interpretation of this statute upon the Court in the present case.  The rule is stated at page 381 in State, ex rel. Morris v. Industrial Commission of Ohio, 134 Oh St 380, and its application limited in State. ex rel. Brooks Equipment and Manufacturing Co. v. Evatt, Director, etc., 137 Oh St 125 as follows:

"However, an administrative practice cannot prevail over the clear requirements of the statute which set up a different procedure."

We have not discussed the effect of any administrative interpretation for the reason that, in our opinion, there is no "doubtful meaning" of the statute.  It is our opinion that the language of the statute is clear.

Counsel for the defendant urge that in determining the issues of this case, the law should be liberally construed.  State, ex rel. The National Mutual Life Insurance Co. v. Conn, Superintendent, 115 Oh St 607; State, ex rel. Federal Union Insurance Co. v. Warner, 128 Oh St 261, and State, ex rel. Allstate Insurance Co. v. Bowen, 130 Oh St 347.  In view of our conclusions already announced herein, there are, at least, two other well established rules that must be considered.  The first one is that "Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation."  37 O. Jur. 514, Section 278.  The second is that "In the construction of statutes it is the expressed legislative intent that is of importance.  The law does not concern itself with the legislature's unexpressed intention.  The question is not what the General Assembly intended to enact, but what is the meaning of that which it did enact."  37 O. Jur. 525, Section 281.

As we have already indicated, it is our opinion that the expressed intent of the legislature is clear and unambiguous.  Therefore, we need not resort to rules of statutory interpretation.  Furthermore, we observe in passing that if, during all of the years that the plan has been in operation in Ohio, it had been the desire and intention of the legislature to terminate it, that could have been done in clear and concise language.

Coming now to the specific prayers of the petition, it is the opinion of the Court, for the reasons given, that §3911.20 R. C. (formerly §9404 GC), does not prohibit the operation of the plaintiff's Assured Home Ownership Plan as outlined by the evidence in this case and that said plan, in and of itself, does not violate said section and is not illegal.

It is further the opinion of the Court that the defendant be enjoined from taking any steps or proceedings to compel the plaintiff to discontinue the operation of the plan, as it is now framed and operating in Ohio. However, we are of the opinion that we may not enjoin the defendant from "taking or instituting any proceedings for the revocation of plaintiff's license to do business in the State of Ohio by reason of the operation of the Plan in Ohio." Such an order would be too broad. In spite of our conclusion that the plan per se does not violate §3911.20 R. C., we have no means of knowing what might transpire in the future "by reason of the operation of the Plan in Ohio." That is to say, this Court has no authority to limit the defendant's statutory powers in the event that the laws of Ohio are violated in the operation of the plan in Ohio. The defendant, however, has no right to revoke plaintiff's license to do business in Ohio as long as the plan is operated in Ohio as outlined by the evidence of this case.